AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Southern District of Ohio

FILED
RICHARD W. NAGEL
CLERK OF COURT
2020 JAN -3 AM 9: 31
U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
WESTERN DIV. DAYTON

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>INFORMATION ASSOCIATED WITH INSTAGRAM<br>USER ID mhn_beezo THAT IS STORED AT PREMISES<br>CONTROLLED BY FACEBOOK INC. | )<br>)<br>)<br>)<br>)<br>) Case No.  3:20 mj 007■■ |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

SEE ATTACHMENT A

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC 841 | Distribution of a controlled substance. |

The application is based on these facts:

SEE ATTACHED AFFIDAVIT

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

SA P. Andrew Gragan, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  01/03/2020

*Judge's signature*

City and state:  Dayton, Ohio

Sharon L. Ovington, U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO

IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED WITH
INSTAGRAM USER ID mhn_beezo THAT IS
STORED AT PREMISES CONTROLLED BY
FACEBOOK INC.

Case No. _____ **3.20 mj 007**

**Filed Under Seal**

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, P. Andrew Gragan, being first duly sworn, hereby depose and state as follows:

### Introduction and Agent Background

1.      I make this affidavit in support of an application for a search warrant for

information associated with an Instagram, LLC account described as: **mhn_beezo** (the

"**ACCOUNT**") that is stored at premises owned, maintained, controlled, or operated by

Instagram, LLC, ("Instagram") a social-networking company owned by Facebook, Inc. which is

headquartered in Menlo Park, California. The information to be searched is described in the

following paragraphs and in Attachment A. This affidavit is made in support of an application

for a search warrant under 18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A), requiring Instagram to

disclose to the government certain records and other information in its possession, including the

contents of communications, pertaining to the subscriber or customer associated with the

**ACCOUNT**.

2.      I am a Special Agent with the Federal Bureau of Investigation ("FBI"), Cincinnati

Division. I have been employed as a Special Agent with the FBI since May 2016. I have

received training in national-security investigations and criminal investigations. I have

specifically conducted investigations related to international terrorism, white-collar crimes, drug

trafficking, public corruption, firearms, and violent crimes. As part of these investigations, I have participated in physical surveillance and records analysis, worked with informants, conducted interviews, served court orders and subpoenas, and executed search and arrest warrants.

     3.     Based on my aforementioned training and experience, I am familiar with the modus operandi of persons involved in the illicit distribution of controlled substances and as a result, know the following:

    a.     It is common practice for drug traffickers to hide their assets, their addresses, their telephone numbers and cellular services by using aliases or other person's names in order to avoid detection by law enforcement officials

    b.     It is common practice for drug traffickers to often maintain residences which are used as "stash houses" or locations for drug storage and distribution.

    c.     It is common practice for drug traffickers to use "nominees" to obtain telephone service, utility service, and other services to hide the true identity of the owner or person who will use that service.

    d.     It is common practice for drug traffickers to often place assets in corporate entities in order to avoid detection of those assets by law enforcement officials.

    e.     It is common practice, that even though these assets are in nominee names, drug traffickers will continue to utilize these assets by exercising dominion and control over them.

    f.     It is common practice for drug traffickers to possess large amounts of U.S. Currency in order to finance their ongoing illicit drug business.

    g.     It is common practice for drug traffickers to maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other documents relating to the transportation and distribution of drugs. Drug traffickers commonly front (provide drugs on consignment) to their clients. The books, records, receipts, notes, ledgers, and other documents are commonly kept where the drug traffickers have ready access to them.

    h.     It is common for drug traffickers to provide false information to law enforcement officials regarding their true identity and the address of their actual residence.

    i.     It is common for persons involved in drug trafficking to conceal in their residences, vehicles, and businesses the following items: drugs, large amounts of

currency, financial instruments, jewelry, automobile titles, other items of value and/or proceeds of drug transactions, and evidence of financial transactions relating to the acquisition and concealment of large sums of money resulting from drug trafficking activities.

j.       When drug traffickers amass large proceeds from the sale of drugs, they commonly attempt to hide the true source of these profits, otherwise known as laundering the money. To accomplish this, drug traffickers many times utilize banks and/or financial institutions with their attendant services, including but not limited to, cashier's checks, money drafts, and letters of credit. Other entities used to launder drug proceeds include real estate firms and purported legitimate business fronts.

k.       Drug traffickers commonly travel to facilitate their drug trafficking activities. After purchasing drugs, drug traffickers commonly transport, or cause to be transported, drugs to areas in which they will be distributed. Common methods of transportation include, but are not limited to, commercial airlines, and rental/private automobiles.

l.       It is common practice for drug traffickers to commonly maintain books and similar documents which reflect names, addresses, and/or telephone numbers of their associates in the drug trafficking organization. This information is commonly stored in cellular phones in places such as the contacts list.

m.       Drug traffickers frequently have been known to take, or cause to be taken, photographs of themselves, their associates, their property and their product, and that the photographs are usually maintained at the residences and/or businesses of drug traffickers.  Photographs such as these can commonly be found and stored in cellular phones.

n.       Drug traffickers have commonly been known to have in their possession, (that is on their person, at their residence, and/or their business) weapons, including firearms of various types.  Firearms are used to protect and secure a drug trafficker's property which may include, but is not limited to, narcotics, jewelry, narcotics paraphernalia, books, records, and U.S. Currency.

o.       Drug traffickers frequently maintain hidden compartments within their residence and vehicles to hide drug trafficking contraband and other incriminating evidence (money, ledgers, drugs, etc.), bury evidence in containers such as shoe boxes, or hide the evidence in safes.

p.       It is uncommon for drug traffickers to openly discuss the exact quantities, prices, dates, and methods of delivery of drugs are in detailed terms over the telephone.  These details are usually agreed upon during face-to-face transactions.  For this reason, most telephone conversations regarding drugs are very brief and often in code, understood by

the traffickers and designed to mislead or confuse non-participants of the conversations. Drug traffickers commonly make extensive use of cellular phones and text messaging beepers/pagers to facilitate contacting one another. When calling a beeper or text messaging, traffickers commonly input the number that should be called and sometimes add additional instructions in the form of additional digits. The structure of a drug distribution organization usually consists of sources of supply, wholesale distributors, retail distributors, and the ultimate consumers. The wholesale distributors often have more than one source of supply, and likewise the retail distributors often obtain drugs from more than one wholesale distributor. After receiving a quantity of drugs, the source of supply will often move the drugs to a location other than where he/she sells them to the wholesale distributors. The location of the source of supply's so-called "stash house" is generally a well-guarded secret known only to the source of supply and his closest associates. Most of the drugs, as well as diluting and packaging materials and weighing equipment, are usually kept at the "stash house." Only those amounts needed for immediate sale are usually kept at the point of sale.

q.      Drug traffickers frequently use rental vehicles for everyday travel and will maintain another vehicle, usually at an out of sight location, to facilitate their drug trafficking business.

r.      Evidence of past communication between drug traffickers can be found in saved or deleted text messages, call logs, and other forms of electronic communication occurring over, stored in, or accessed by the cellular phone.

s.      I have repeatedly encountered a practice wherein drug traffickers distribute a cellular telephone number to their drug customers, often described by traffickers as a so-called "money phone." The money phone is used primarily to communicate with those customers. The customers will subsequently call the trafficker on that cellular telephone number to arrange a purchase of drugs as needed. The trafficker will many times field calls from several customers at once, and then direct all those customers to travel in their car to a designated meeting point. Once all the customers have driven to the designated place, the drug trafficker will appear in his vehicle, quickly conduct hand to hand drug transactions with each customer, and then drive away.

4.      The facts in this affidavit are based upon my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. § 841 (Distribution of a controlled substance) have been committed by **Charles Edward Harper** ("**HARPER**"). As such, there is also probable cause to search the information and evidence described in Attachment A, and seize items described in Attachment B.

### JURISDICTION

6.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

### Probable Cause

7.     On or about August 6, 2019, the FBI, assisted the Dayton Police Department in the investigation of a mass shooting that occurred in "the Oregon District" of the city, on or about August 4, 2019. A search warrant issued by the Dayton Municipal Court was served on Facebook, Inc., for an account associated with a Connor Betts, the identified shooter, hereinafter referred to as "Betts," Instagram account "trapaholicb."

8.     On or about August 7, 2019, Facebook provided law enforcement officials certain records in response to the said search warrant for Instagram account "trapaholicb." A subsequent review of the said account by the FBI revealed the following direct messages between Betts and Instagram account **mhn_chuck.**

7/15/2019 – **trapaholicb –** *Ayy whatre y' all s prices for kpins and soft white*

7/15/2019 – **mhn_chuck** – *Don' t kno bout k pins but I' m finna check up on the way soda*

5

7/15/2019 – **trapaholicb** – *Ight*

7/19/2019 – **trapaholicb** – *Ayy any word bout them pins?*

7/21/2019 – **mhn_chuck** – *Bro don' t got the klonos g but he got perks and like a off brand xan. I took one of them bitches lastnight and it put me on my ass*

7/21/2019 – **trapaholicb** – *Ight. Lemme get 2 of them*

7/21/2019 – **mhn_chuck** – *Ight g I' m finna text em and c how much he lettin em go for*

7/21/2019 – **trapaholicb** – *Iiiight thx b*

9.      Based on my training and experience, I know that "kpins," "pins," or "klonos" are street terms referencing Klonopin. I also know that "xan" is a *street term* referencing Xanax. Klonopin and Xanax are both benzodiazepines, which are Schedule IV controlled substances. I also know that "perks" is a street term referencing Percocet. Percocet is oxycodone, which is a Schedule II controlled substance. I also know that "soft white" is a street term referencing cocaine, which is a Schedule II controlled substance.

10.      Following the August 4, 2019 shooting incident, Betts' corpse was transported to the Montgomery County Coroner for autopsy. During the autopsy, Dayton Police Officers removed personal effects from the pockets of Betts' person, including an approximate three inch long black straw with a baggie attached to the end of it by a rubber band. Inside this baggie was found a white powder, which the seizing officers, based on their training and experience, suspected to be cocaine. The suspected cocaine was subsequently submitted to the Miami Valley Regional Crime Lab (MVRCL) for forensic testing. On or about August 9, 2019, the MVRCL confirmed that the said white powdery substance was in fact cocaine.

11.      On or about August 4, 2019, the FBI interviewed a personal friend of Betts, who accompanied him to the scene of the shooting, and was subsequently shot and wounded by him.

For the purpose of this affidavit this individual will be referred to as "C.B."  C.B. advised law

enforcement officials that around July 26-28, 2019, Betts indicated to C.B. that he had relapsed

with cocaine and it was not interacting well.

12.     On or about August 4-7, 2019, the FBI interviewed multiple individuals

associated with Betts. One of these individuals was a high school girlfriend of Betts, who for the

purpose of this affidavit will be referred to as "H.S." H.S. advised law enforcement officials that

Betts had previously abused a variety of drugs, including Adderall, Xanax, cocaine, and

marijuana. A co-worker of Betts, who for the purpose of this affidavit will be referred to as

"N.G.," advised law enforcement officials he was aware Betts previously had a

methamphetamine addiction approximately three years ago. A co-worker of Betts, who for the

purpose of this affidavit will be referred to as "K.G.," advised law enforcement officials that

Betts had told K.G. that he used to have a drug abuse problem during high school. When K.G.

inquired what type of drugs Betts was abusing, Betts mentioned huffing and cocaine. A

bandmate of Betts, who for the purpose of this affidavit will be referred to as "J.C.," advised law

enforcement officials that Betts had told J.C. he used to use methamphetamine. A co-worker of

Betts, who for the purpose of this affidavit will be referred to as "C.W.," advised law

enforcement officials that Betts had used methamphetamine in the past. C.W. believed Betts had

been "clean" for approximately four years. A co-worker of Betts, who for the purpose of this

affidavit will be referred to as "A.G.," advised law enforcement officials that he/she believed that

Betts had a history of drug abuse. An acquaintance of Betts, who for the purpose of this affidavit

will be referred to as "J.E," indicated to law enforcement officials that he/she and Betts hung out

at least once a month from 2014 through 2017. J.E. further indicated that Betts was hardly ever

observed to be in a sober state during this time period, and was known to have used heroin,

cocaine, methamphetamine, and prescription narcotics. J.E. further advised that Betts would often show up to his/her home "messed up."

13.    On or about August 7, 2019, the FBI interviewed a former co-worker of Betts, who for the purpose of this affidavit will be referred to as "E.S." E.S. advised law enforcement officials that on or about August 2, 2019, at approximately 4:45p.m., Betts came into his/her place of employment and bought a beer. Before leaving, Betts made the comment, "I just popped a xanny, we'll see how it goes." Based on my training and experience, I know that the term "xanny" is a common street term referencing Xanax.

14.    On or about August 7-8, 2019, the FBI interviewed multiple individuals associated with Betts. An acquaintance of Betts, who for the purpose of this affidavit will be referred to as "J.E." J.E. advised law enforcement officials he/she believed Betts was using various drugs, including cocaine, methamphetamine, heroin, and molly. A friend of Betts, who for the purpose of this affidavit will be referred to as "E.K.," informed law enforcement officials that he/she and Betts had done "hard drugs," marijuana, and acid together four to five times a week during 2014 to 2015.

15.    On or about August 15, 2019, the Montgomery County Coroner's Office completed the toxicology report for Betts. The results of the report confirmed that Betts had alprazolam, cocaine, and ethanol in his system. Alprazolam is a benzodiazepine, of which Xanax is a brand name. Based on this report, Dayton Police Department subsequently revealed to the public that Betts had cocaine, Xanax, and alcohol in his system at the time of his death.

16.    The FBI, pursuant to a search warrant issued by the Dayton Municipal Court, examined stored data contained on Betts' cell phone. In the "contacts section" was a phone number listed as (937) 219-6385 and labeled "Chuck Chipotle." On or about November 5, 2019,

8

Sprint provided to law enforcement authorities certain records in response to a federal grand jury subpoena seeking information concerning said phone number. The subscriber was listed as Charles Ajrper with address of 718 Gruner Avenue, Dayton, Ohio.

17.     A review of Ohio Bureau of Motor Vehicle (BMV) records indicate that **HARPER** resides at 718 Gruner Avenue, Dayton, Ohio.

18.     A review of publically available information associated with the **mhn_chuck** revealed the below profile picture, which appears to be **HARPER** based on a comparison with a known BMV photograph maintained on **HARPER.**



19.     On or about November 13, 2019, the FBI, while reviewing the publicly available information available on the **mhn_chuck** account, observed another Instagram account under display name "Chuck Beezo" and username of **mhn_beezo** (hereinafter the "**ACCOUNT**"). The **ACCOUNT** stated, "New account….. old one @mhn_chuck." The profile picture depicted a mirrored image of an individual wearing a shirt that said "trapper." Based on my training and

experience, I know that the term "trapper" is a street term often used to refer to someone involved in selling, dealing, or trafficking of illicit substances.

20.     On or about November 14, 2019, a preservation request for the **ACCOUNT** was submitted to Facebook by the FBI.

21.     On or about November 14, 2019, Facebook provided records to law enforcement authorities in response to a federal grand jury subpoena seeking information concerning the **mhn_chuck** account**.** The information included subscriber information, including registered email address charlesharper546@gmail.com and phone number (937) 219-6385.

22.     On or about December 4, 2019, a search warrant, issued by the United States District Court for the Southern District of Ohio, for certain records associated with the **mhn_chuck** account was served on Facebook.

23.     Based upon my review of publicly available information provided by Instagram about its service, including Instagram's "Privacy Policy," I have become aware of the following facts listed in paragraphs 24-37 about Instagram and about the information collected and retained by Instagram.

24.     Instagram owns and operates a free-access social-networking website of the same name that can be accessed at http://www.instagram.com.  Instagram allows its users to create their own profile pages, which can include a short biography, a photo of themselves, and other information.  Users can access Instagram through the Instagram website or by using a special electronic application ("app") created by the company that allows users to access the service through a mobile device.

25.     Instagram permits users to post photos to their profiles on Instagram and otherwise share photos with others on Instagram, as well as certain other social-media services,

10

including Flickr, Facebook, and Twitter. When posting or sharing a photo on Instagram, a user can add to the photo: a caption; various "tags" that can be used to search for the photo (e.g., a user made add the tag #vw so that people interested in Volkswagen vehicles can search for and find the photo); location information; and other information. A user can also apply a variety of "filters" or other visual effects that modify the look of the posted photos. In addition, Instagram allows users to make comments on posted photos, including photos that the user posts or photos posted by other users of Instagram. Users can also "like" photos.

26.     Upon creating an Instagram account, an Instagram user must create a unique Instagram username and an account password. This information is collected and maintained by Instagram.

27.     Instagram asks users to provide basic identity and contact information upon registration and also allows users to provide additional identity information for their user profile. This information may include the user's full name, e-mail addresses, and phone numbers, as well as potentially other personal information provided directly by the user to Instagram. Once an account is created, users may also adjust various privacy and account settings for the account on Instagram. Instagram collects and maintains this information.

28.     Instagram allows users to have "friends," which are other individuals with whom the user can share information without making the information public. Friends on Instagram may come from either contact lists maintained by the user, other third-party social media websites and information, or searches conducted by the user on Instagram profiles. Instagram collects and maintains this information.

11

29.     Instagram also allows users to "follow" another user, which means that they receive updates about posts made by the other user.  Users may also "unfollow" users, that is, stop following them or block the, which prevents the blocked user from following that user.

30.     Instagram allow users to post and share various types of user content, including photos, videos, captions, comments, and other materials.  Instagram collects and maintains user content that users post to Instagram or share through Instagram.

31.     Instagram users may send photos and videos to select individuals or groups via Instagram Direct.  Information sent via Instagram Direct does not appear in a user's feed, search history, or profile.

32.     Users on Instagram may also search Instagram for other users or particular types of photos or other content.

33.     For each user, Instagram also collects and retains information, called "log file" information, every time a user requests access to Instagram, whether through a web page or through an app.  Among the log file information that Instagram's servers automatically record is the particular web requests, any Internet Protocol ("IP) address associated with the request, type of browser used, any referring/exit web pages and associated URLs, pages viewed, dates and times of access, and other information.

34.     Instagram also collects and maintains "cookies," which are small text files containing a string of numbers that are placed on a user's computer or mobile device and that allows Instagram to collect information about how a user uses Instagram.  For example, Instagram uses cookies to help users navigate between pages efficiently, to remember preferences, and to ensure advertisements are relevant to a user's interests.

35. Instagram also collects information on the particular devices used to access Instagram. In particular, Instagram may record "device identifiers," which includes data files and other information that may identify the particular electronic device that was used to access Instagram.

36. Instagram also collects other data associated with user content. For example, Instagram collects any "hashtags" associated with user content (i.e., keywords used), "geotags" that mark the location of a photo and which may include latitude and longitude information, comments on photos, and other information.

37. Instagram also may communicate with the user, by email or otherwise. Instagram collects and maintains copies of communications between Instagram and the user.

38. On or about November 14, 2019, I served Instagram with a preservation request pursuant to 18 U.S.C. § 2703(f), requiring Instagram to preserve all information associated with the **ACCOUNT.**

39. As explained herein, information stored in connection with an Instagram account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. Based on my training and experience, my review of an Instagram user's account activity, IP log, stored electronic communications, and other data retained by Instagram, can indicate who has used or controlled the Instagram account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, direct messaging logs, shared photos and videos, and captions (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used

or controlled the Instagram account at a relevant time. Further, Instagram account activity can show how and when the account was accessed or used. For example, as described herein, Instagram logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Instagram access, use, and events relating to the crime under investigation. Additionally, Instagram builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Instagram "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Instagram account owner. Last, Instagram account activity may provide relevant insight into the Instagram account owner's state of mind as it relates to the offense under investigation. For example, information on the Instagram account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

40.     Based on the information above, the computers of Instagram are likely to contain all the material described above with respect to the **ACCOUNT**, including stored electronic communications and information concerning subscribers and their use of Instagram, such as account access information, which would include information such as the IP addresses and devices used to access the account, as well as other account information that might be used to identify the actual user or users of the account at particular times.

## **Information To Be Searched And Things To Be Seized**

41.     I anticipate executing this requested search warrant under the Electronic

Communications Privacy Act, in particular Title 18, United States Code, Sections 2703(a),

(b)(1)(A), and (c)(1)(A), by using the warrant to require Instagram to disclose to the government

copies of the records and other information (including the content of communications)

particularly described in Section I of Attachment B.  Upon receipt of the information described

in Section I of Attachment B, government-authorized persons will review that information to

locate the items described in Section II of Attachment B.

## **Conclusion**

42.     Based on the aforementioned factual information, I respectfully submit that there

is probable cause to believe that evidence, fruits, and instrumentalities of violations, or attempted

violations, of 21 U.S.C. § 841 may be located in the **ACCOUNT** records described in

Attachment A.

43.     Based on the forgoing, I request that the Court issue the proposed search warrant.

44.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not

required for the service or execution of this warrant.  The government will execute this warrant

by serving it directly on Instagram.  Because the warrant will be served on Instagram, who will

then compile the requested records at a time convenient to it, there exists reasonable cause to

permit the execution of the requested warrant at any time in the day or night.

## **REQUEST FOR SEALING**

45.     I further request that the Court order that all papers in support of this application,

including the affidavit and search warrant, be sealed until further order of the Court.  These

documents discuss an ongoing criminal investigation that is neither public nor known to all of

the targets of the investigation. Accordingly, there is good cause to seal these documents

because their premature disclosure may seriously jeopardize that investigation.

P. Andrew Gragan
Special Agent
Federal Bureau of Investigation

SUBSCRIBED and SWORN to before me on _____Jan 3_____, 2020

SHARON L. OVINGTON
UNITED STATES MAGISTRATE JUDGE

16

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the Instagram profile with username:

### mhn_beezo

that is stored at premises owned, maintained, controlled, or operated by Instagram, LLC, a

company that is owned by Facebook, Inc. which is headquartered in Menlo Park, California.

## ATTACHMENT B

### Particular Things to be Seized

**I.     Information to be disclosed by Instagram, LLC**

To the extent that the information described in Attachment A is within the possession, custody, or control of Instagram, LLC, including any messages, records, files, logs, or information that have been deleted but are still available to Instagram, LLC, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Instagram, LLC is required to disclose the following information to the government for each account listed in Attachment A:

a.     All identity and contact information, including full name, e-mail address, physical address (including city, state, and zip code), date of birth, phone numbers, gender, hometown, occupation, and other personal identifiers;

b.     All past and current usernames associated with the account;

c.     The dates and times at which the account and profile were created, and the Internet Protocol ("IP") address at the time of sign-up;

d.     All activity logs including IP logs and other documents showing the IP address, date, and time of each login to the account, as well as any other log file information;

e.     All information regarding the particular device or devices used to login to or access the account, including all device identifier information or cookie information, including all information about the particular device or devices used to access the account and the date and time of those accesses;

f.     All data and information associated with the profile page, including photographs, "bios," and profile backgrounds and themes;

g.     All communications or other messages sent or received by the account **January 1, 2019 to Present;**

h.     All user content created, uploaded, or shared by the account, including any comments made by the account on photographs or other content **January 1, 2019 to Present;**

i.     All photographs and images in the user gallery for the account **January 1, 2019 to Present;**

j.     All location data associated with the account, including geotags **January 1, 2019 to Present;**

k.    All data and information that has been deleted by the user **January 1, 2019 to Present;**

l.    A list of all of the people that the user follows on Instagram and all people who are following the user (*i.e.*, the user's "following" list and "followers" list), as well as any friends of the user;

m.    A list of all users that the account has "unfollowed" or blocked;

n.    All privacy and account settings;

o.    All records of Instagram searches performed by the account, including all past searches saved by the account **January 1, 2019 to Present;**

p.    All information about connections between the account and third-party websites and applications; and,

q.    All records pertaining to communications between Instagram, LLC and any person regarding the user or the user's Instagram account, including contacts with support services, and all records of actions taken, including suspensions of the account.

Instagram is hereby ordered to disclose the above information to the government within fourteen days of issuance of this warrant.

## II.    Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 21 U.S.C. § 841 involving Charles Edward Harper since January 1, 2019, including, for each username identified on Attachment A, information pertaining to the following matters:

(a) Evidence indicating the sale, possession, distribution, or production of illegal drugs;

(b) Evidence indicating how and when the Instagram account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Instagram account owner;

2

(c) Evidence indicating the Instagram account owner's state of mind as it relates to the crime under investigation;

(d) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s);

(e) The identity of the person(s) who communicated with the user ID about matters relating to the sale, possession, distribution, or production of illegal drugs, including records that help reveal their whereabouts.

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws

of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in

this certification is true and correct.  I am employed by Instagram, LLC, and my title is

_____.  I am qualified to authenticate the records attached hereto

because I am familiar with how the records were created, managed, stored, and retrieved.  I state

that the records attached hereto are true duplicates of the original records in the custody of

Instagram, LLC.  The attached records consist of _____ **[GENERALLY**

**DESCRIBE RECORDS (pages/CDs/megabytes)]**.  I further state that:

a.      all records attached to this certificate were made at or near the time of the

occurrence of the matter set forth by, or from information transmitted by, a person with

knowledge of those matters, they were kept in the ordinary course of the regularly conducted

business activity of Instagram, LLC, and they were made by Instagram, LLC as a regular

practice; and

b.      such records were generated by Instagram, LLC's electronic process or system

that produces an accurate result, to wit:

1.      the records were copied from electronic device(s), storage medium(s), or

file(s) in the custody of Instagram, LLC in a manner to ensure that they are true duplicates of the

original records; and

2.    the process or system is regularly verified by Instagram, LLC, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____    _____

Date                                   Signature